

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-1996

# United States v. Balter

Precedential or Non-Precedential:

Docket 94-5593,94-5625,94-5626

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Balter" (1996). *1996 Decisions.* Paper 130.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/130

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 94-5593, 94-5625, 94-5626
_____

UNITED STATES OF AMERICA

v.

RICHARD BALTER
        Appellant No. 94-5593


UNITED STATES OF AMERICA

v.

KENNETH CUTLER
        Appellant No. 94-5625


UNITED STATES OF AMERICA

v.

CHRIS OSCAR DEJESUS
        Appellant No. 94-5626
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Criminal Nos. 93-00536-1, 93-00536-2 and 93-00536-4)
_____

Argued: March 6, 1996
Before:  MANSMANN, ALITO, and LEWIS, Circuit Judges

(Opinion Filed: July 29, 1996)

_____

Faith S. Hochberg
United States Attorney
Kevin McNulty (Argued)
Chief, Appeals Division
Renee M. Bumb
Assistant United States Attorney
970 Broad Street
Newark, New Jersey 07102

Counsel for Appellee

Paul B. Brickfield, P.C. (Argued)
70 Grand Avenue
River Edge, New Jersey 07661

Richard E. Mischel, Esq.
Kenneth Cutler, Esq.
233 Broadway, Suite 3507
New York, New York 10279

Salvatore C. Adamo, Esq.
412 Liggett Boulevard
Phillipsburg, New Jersey 08865-4016

Counsel for Appellant

OPINION OF THE COURT

ALITO, Circuit Judge:

This case comes before us as a consolidated appeal from judgments of sentence imposed upon Richard Balter, Kenneth Cutler, and Chris Oscar DeJesus. After a joint trial, Balter, Cutler, and DeJesus were convicted for the murder-for-hire of Richard Cohen, in violation of 18 U.S.C. 1958 and 2, and Balter and Cutler were also convicted on related counts of mail fraud, in violation of 18 U.S.C. 1341, 1342. Although numerous allegations of error are raised, one issue -- whether New Jersey Rule of Professional Conduct 4.2 which prohibits an attorney from contacting a represented party applies to federal prosecutors acting in the course of a pre-indictment investigation -- is a question of first impression for our court. We affirm.

I.

Richard Balter was the president and sole shareholder of Northeastern Poly Products, Inc. ("NPP") of Fairfield, New Jersey. NPP sold and distributed plastic bag products. Balter met Kenneth Cutler in the mid-1980's when Cutler was working for one of NPP's customers. Balter and Cutler had an arrangement under which Balter paid cash kickbacks to Cutler in exchange for the purchase of NPP's products. The cash for these kickbacks was generated by issuing checks to the fictitious payee "Robert Katz." In 1992,

Balter hired Cutler to work at NPP, and shortly after Cutler arrived, Balter and Cutler formed another plastic bag product company, International Syndication of America ("ISA").

Robert Cohen owned and operated Uneeda Manufacturing Corporation ("Uneeda") in the Bronx, New York.  Uneeda was an NPP customer that manufactured garbage cans and distributed plastic garbage bags.  Uneeda was NPP's most delinquent account.  By the early 1990's, Uneeda's outstanding balance had grown to approximately $600,000.    Balter initially tried to collect this debt by calling Cohen, and Cutler became involved with these collection efforts soon after joining NPP.  Cutler had known Cohen for many years prior to his involvement with Balter.  In fact, Cutler had been Cohen's best man at his wedding.  Trial tr. at 3393.  Cutler believed that NPP could not withstand the "financial blow" if Uneeda defaulted.  At one point, Cutler commented to an NPP employee that "something had to be done" and that "he was going [to] take care of the Uneeda problem." SA. 354.

Cohen began to worry that his business relationship with NPP had deteriorated to such a point that Balter would refuse to supply him with products.  Fearing that this would thwart Uneeda's ability to make sales and generate income to pay its debts, Cohen discussed this problem with his long-time insurance agent, Jefferey Liederman, at New York Life Insurance Company ("New York Life").  Liederman suggested that Cohen take out a life insurance policy and that he name Balter as the beneficiary as a sign of good faith to convince Balter not to cut off Uneeda's product supply.  Cohen agreed.

Balter and Cutler were also Liederman's clients, and Liederman discussed the Uneeda account deficit with them over lunch on several occasions.  After Cohen agreed to take out the life insurance policy, Liederman reviewed with Balter the tax advantages that he would gain as the owner and beneficiary of that policy.

In February 1992, New York Life received an application for a $600,000 life insurance policy designating Cohen as the owner of the policy and his estate as the beneficiary. The application was accepted.  About a month later, New York Life received a change of beneficiary form changing the ownership of the policy to Richard Balter and designating "Richard Balter-Creditor" as the new beneficiary.  Balter paid the first month's premium on

the policy and each monthly payment thereafter.

In September 1992, Cutler contacted Gustavo Gil, a former co-worker. Cutler and Gil had worked together at the Chrysler Corporation beginning in 1979, but they had not spoken in several years. Cutler told Gil that he wanted to introduce him to a friend, but would not explain the reason for the introduction.

Gil met Cutler and Balter at a diner in Secaucus, New Jersey. After introductions, Balter told Gil that "there was a person who owed him a lot of money and who ha[d] insulted him and he wanted this man shot and killed." SA. 21. Balter described the victim as a businessman in the Bronx, but he did not name him. Balter asked Gil if he knew anyone who could do the killing, and Gil indicated that he did. Balter explained that he was willing to pay "ten thousand dollars or more if necessary" for the murder. SA. 22. Cutler instructed Gil to call them when he located someone to commit the murder. Balter and Cutler also offered to set Gil up in NPP's warehouse so that Gil could start his own business.

Over the course of the next month, Balter and Cutler pressed Gil to find someone to commit the murder. NPP's bankers were threatening to withdraw NPP's line of credit due to concern about the Uneeda account. Balter gave Gil an office in the NPP warehouse and other assistance to start his own business reconditioning automotive engines. During this period, Gil learned that Cohen was the intended victim. On one occasion, he travelled with Balter's driver to Uneeda at Balter's behest. Gil met Cohen at Uneeda and engaged him in conversation for approximately five minutes.

In December 1992, Gil contacted Manuel Garcia at a video store in Brooklyn, New York, to help him find someone to kill Cohen. Garcia had worked for Gil in 1989, and Garcia had often talked about the people he knew in a gang called the "Tigres." Garcia had told Gil that the "Tigres" were involved in drug sales, murders, and other violent crimes. SA. 13-14.

Gil told Garcia that the people he represented would pay $10,000 to have Cohen killed. Garcia expressed interest and said that he had "just the guy" to carry out the murder. SA. 51. Garcia immediately introduced Gil to DeJesus. DeJesus acknowledged that he had done this type of work in the past, but stated that he had not done it recently. However, he

admitted that he needed the money and therefore agreed to commit the murder. DeJesus demanded half of the money in advance. Gil then drove DeJesus to Uneeda and explained to him the details of the plan to kill Cohen.

Gil went to Balter that same day and informed him that DeJesus would do the job for $10,000, if half was paid up front. Balter gave Gil $5,000 in cash that he had generated by writing checks for fictitious expenses. Gil delivered the $5,000 to DeJesus the following day.

Meanwhile, Balter and Cutler were planning the details of the murder. On January 8, 1993, they drove to Cohen's home near Peekskill, New York. They considered ambushing Cohen in his own neighborhood but concluded that Cohen's business in the Bronx would be a better location for the killing. While Balter and Cutler were near Cohen's house, his housekeeper spotted them and became suspicious. She told Cohen what she had seen and described Balter's car to him. Cohen became concerned and contacted Liederman. He told Liederman that he believed that Balter meant to harm him and indicated that he wanted Balter removed as the beneficiary of the insurance policy. Liederman explained that Balter owned the policy and that Cohen therefore could no longer change the beneficiary.

Gil and DeJesus drove to Uneeda on the morning of January 19, 1993. Garcia was originally supposed to drive DeJesus, but the two had had a disagreement, and Gil had assented that morning to drive DeJesus to the murder scene. Cohen arrived late for work. By the time he arrived, the street was too busy to attempt the shooting. Gil and DeJesus left Uneeda and went directly to Balter's office at NPP to tell him of the aborted attempt. They agreed to try again the next morning. Balter stressed to DeJesus that he wanted Cohen dead, not injured. He told DeJesus to shoot Cohen in the head and to drop a bag of cocaine by the body to give the appearance of a drug-related killing. DeJesus assured Balter that he knew what to do and that he had done this before. Balter also told DeJesus that "if there are other people there when [Cohen's] there . . . shoot them all." SA. 94.

Gil and DeJesus drove to Uneeda the next morning, January 20, 1993. When Cohen arrived, DeJesus engaged him in a short conversation and then shot him at least three

times in the chest with a pistol.  An eyewitness to the shooting described the shooter as a light-skinned Hispanic man, between 21-27 years old, approximately 5'6," of medium build, with straight black bangs and a moustache.

After the murder, Gil and DeJesus drove back to NPP.  Balter gave DeJesus more money and told him that he would give him additional money "in a couple of months." SA. 111.  Cohen remained unconscious until he died on March 5, 1993.  Balter and Cutler then submitted a claim form requesting payment on the life insurance policy.

In the meantime, federal law enforcement agents began investigating the murder.  Shortly after the investigation commenced, Gil admitted his role in the killing and secretly began cooperating with federal officers.  He surreptitiously recorded numerous live and telephone conversations with each of his co-conspirators.  The taped conversations include discussions about the murder, the cover-up, and payments made to DeJesus for committing the murder.  They largely corroborate Gil's extensive testimony identifying the different roles each of the defendants had in the murder scheme.

On November 9, 1993, a federal grand jury in the District of New Jersey returned an indictment against Balter, Cutler, DeJesus, and Garcia, and all of the defendants were arrested the following day.  DeJesus was arrested in Aberdeen, North Carolina.  After signing a written waiver-of-rights form and answering some brief biographical questions, he was given a copy of the indictment against him and was taken for an initial appearance.  He made no further statements until two days later when he called the arresting postal inspector in an attempt to make a deal.

The defendants were jointly tried in the United States District Court for the District of New Jersey beginning in late May 1994.  At the end of the government's case, the defendants moved for judgment of acquittal on all counts, and the government moved for the voluntary dismissal of three counts of mail fraud and aiding and abetting against Balter and Cutler.  The district court granted the government's motion and denied the defendants' motion to dismiss the remaining counts.

Balter presented no defense.  Cutler testified on his own behalf, but presented no other witnesses.  DeJesus presented one witness.  The jury found the defendants guilty of

all the remaining counts on June 27, 1994.  The district court imposed sentences of life imprisonment on all of the defendants, and they then appealed.

## II.

On appeal, Balter argues that the district court erred by: (1) denying his repeated motions for a severance; (2) refusing to suppress his taped statements on the ground that they were made in violation of New Jersey Rule of Professional Conduct 4.2; and (3) admitting certain evidence under Federal Rule of Evidence 404(b).  Cutler appeals solely on the issue of severance.  DeJesus contends: (1) that the district court erred by improperly admitting Rule 404(b) evidence against him; (2) that the government impermissibly commented on his post-arrest silence in its summation in violation of Doyle v. Ohio, 426 U.S. 610 (1975); (3) that the government improperly shifted the burden of proof to him during its summation; (4) that the government retreated from its theory of the case during its closing and created a variance from the indictment; (5) that the district court erroneously admitted his high school yearbook photograph; and (6) that the cumulative effect of these alleged errors requires the reversal of his conviction.  We will address each of these arguments seriatim.

## III.

A.  Balter and Cutler claim that they had "mutually antagonistic defenses" at trial and that the district court therefore erred in failing to grant their repeated motions for a severance.  We reject this argument.

As the Supreme Court observed in United States v. Zafiro, 506 U.S. 534, 537 (1993) (quoting Richardson v. Marsh, 481 U.S. 200, 209 (1987)), "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," because joint trials "promote efficiency and `serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  In Zafiro, as in this case, the defendants argued that they had been prejudiced because they had "mutually antagonistic" or "irreconcilable" defenses, and they urged the Court to adopt "a bright-line rule, mandating severance whenever codefendants have conflicting defenses."  Id. at 538.  The Court, however, explicitly declined to adopt such a rule.  Id. at 538.  Rather, the Court instructed that trial courts should grant a severance under

Fed. R. Crim. P. 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 538-39. "Such a risk might occur," the Court observed, "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Id. at 539. The Court cited three specific examples in which this might take place: (1) "a complex case" involving "many defendants" with "markedly different degrees of culpability," (2) a case such as Bruton v. United States, 391 U.S. 123 (1968), where evidence that is probative of one defendant's guilt is technically admissible only against a co-defendant, and (3) a case where evidence that exculpates one defendant is unavailable in a joint trial. Zafiro, 506 U.S. at 539.

Since Zafiro, claims based on mutually antagonistic defenses have usually been found insufficient to warrant severance without a strong showing that such specific rights were impaired. See, e.g., United States v. Voight, ___ F.3d ___, ___ (3d Cir. 1996); United States v. Frost, 61 F.3d 1518, 1526 (11th Cir. 1995); United States v. Quintero, 38 F.3d 1317, 1341-42 (3d Cir. 1994), cert. denied, 115 S.Ct. 1263 (1995); United States v. Linn, 31 F.3d 987, 992 (10th Cir. 1994); United States v. Dimas, 3 F.3d 1015, 1020 (7th Cir. 1993).

A denial of a motion for severance may be reversed only if the district court abused its discretion. Zafiro, 506 U.S. at 541; United States v. Thornton, 1 F.3d 149, 152 (3d Cir.), cert. denied, 114 S.Ct 483 (1993). Defendants seeking to overturn a district court's discretionary decision to deny a motion for severance "must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." United States v. Voight, ___ F.3d at ___; United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991), cert. denied 502 U.S. 925 (1991). "`Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant' or some evidence adduced is `more damaging to one defendant than others.'" United States v. Console, 13 F.3d 641, 655 (3d Cir. 1993), cert. denied, 114 S. Ct. 1660 (1994) (citing Eufrasio, 935 F.2d at 568).

In this case, although Balter and Cutler maintain that they had mutually antagonistic defenses at trial, they have not identified any specific trial rights that were compromised by the joint trial; nor have they demonstrated that the joint trial impeded the jury from making a reliable judgment about guilt or innocence. Accordingly, we find no abuse of discretion on the part of the trial judge in denying their severance requests.

B. Balter claimed complete innocence and alleged that Cutler, Gil, Garcia, and DeJesus murdered Cohen and then sought to extort Balter by threatening to frame him with the murder. Balter alleges generally that the joint trial was unreliable and that he was "repeatedly denied the opportunity to present his defense and adequately cross-examine witnesses testifying against him." Balter Br. at 15. Balter's most specific allegations of prejudice are (a) that he was denied the right to cross-examine Gil "on numerous occasions" and (b) that the court refused to admit evidence that he proffered to show that he had sought to disassociate himself from DeJesus and to show that Garcia had a history of murder and other violent conduct. This latter evidence, Balter argues, would have supported his defense that he succumbed to the others' extortion after the murder because he feared Garcia.

Balter's arguments are inconsistent with the record. Although he claims that his attorney was unduly restricted in his cross-examination of Gil, this cross-examination was detailed and extensive, JA. 491-869, and Balter has not cited any specific information that would have been helpful to his defense and that he was not permitted to elicit from Gil. Nor has he cited any evidence that was admitted against him that would have been inadmissible had he been tried separately.

Furthermore, neither of the two rather routine evidentiary rulings of which Balter complains resulted in prejudice that approached a level that would have warranted a severance. First, Balter sought to introduce a portion of transcript containing his statement that he did not want to be associated with DeJesus because DeJesus had a criminal record. Balter wanted to introduce this portion of the transcript to corroborate his claim that he feared DeJesus. However, DeJesus, although he might have been involved in past criminal conduct,

did not have a criminal record. Consequently, the court permitted Balter to introduce a redacted version of the transcript that included Balter's statement that he did not wish to be associated with anyone but that omitted the portion of the statement reflecting Balter's erroneous belief that DeJesus had a criminal record. SA. 243. The court further ruled that Balter's attorney, in cross-examining Gil, could ask him if he had told Balter that DeJesus had a criminal record but that if Balter's attorney asked this question the court would instruct the jury that DeJesus did not have a record. Balter's attorney then elected not to pursue this matter in cross-examining Gil. The district court's handling of this issue was fair and sensitive to the needs of Balter's defense, and the likelihood that the redaction of the transcript had any detrimental effect on Balter seems quite low.

Second, Balter challenges the district court's exclusion of Gil's proposed testimony that Garcia had told him that he had recently committed another murder in order to convince Gil that he was qualified for the present job. The court ruled that the prejudicial effect of this statement on co-defendant Garcia outweighed the probative value for Balter to establish fear. Nevertheless, the court permitted Balter to elicit testimony about Garcia's involvement with a violent drug gang that was involved in "[d]rug sales, violent acts, [and] murder." JA. 1310-11. This was adequate to support Balter's claim of fear.

We conclude that Balter cannot show prejudice from the joint trial and that the district court did not abuse its discretion in denying his motions for a severance.

C. Cutler maintained that he did not participate in the murder and merely helped to cover up Balter's involvement after the fact. Cutler argues that the trial court's failure to grant his severance motions prejudiced him by creating the incentive for Balter's counsel to become a "second prosecutor." There are pre-Zafiro cases that advanced the "second prosecutor" theory as a ground for requiring severance. See United States v. Tootick, 952 F.2d 1078, 1082 (9th Cir. 1991); United States v. Romanello, 726 F.2d 173, 179 (5th Cir. 1984). Justice Stevens also noted it as a potential problem in his concurrence in Zafiro. Id. 506 U.S. at 544. Cutler, however, cites no post-Zafiro cases reversing a trial judge's

denial of a severance on the basis of this theory, and we are not aware of any such cases. In fact, Cutler concedes that Tootick, one of the leading cases embracing this theory and one of the cases on which he relies most heavily, was subsequently limited to its facts by the Ninth Circuit after Zafiro. United States v. Buena-Lopez, 987 F.2d 657, 660-61 (9th Cir. 1993). The court observed in Buena-Lopez that the relevant inquiry after Zafiro focuses on specific and significant prejudice to the defendant, not on a more general "second prosecutor" theory. Id.

Cutler's only specific claim of prejudice is that the district court refused to permit him to introduce hundreds of checks made out to the fictitious payee "Robert Katz." After the government introduced five such checks in order to show the method by which Balter generated cash to pay for the murder, Cutler sought to introduce all of the "Robert Katz" checks to show that Balter had used such checks to pay Cutler for other services and that therefore that the five checks introduced by the government were not necessarily related to the murder. The court excluded the hundreds of checks that Cutler sought to introduce because the court thought that they would confuse the jury, but the court allowed another witness to testify about all of the checks. JA. 1071. Indeed, Cutler agreed on the record to this approach. Id.

In view of Cutler's acceptance of this approach, we would not find that the district court erred even if Cutler could show that he was prejudiced by not being permitted to introduce the actual checks. See United States v. Olano, 113 S.Ct. 1770, 1777 (1993). But in any event, Cutler has not shown that he suffered prejudice. We therefore hold that the district court did not abuse its discretion in denying his motions for a severance.

IV.

Balter also contends that the district court erroneously admitted taped telephone conversations between himself and Gil. Balter argues that these tapes were made in violation of New Jersey Rule of Professional Conduct 4.2, which prohibits a lawyer from contacting a represented party. Balter maintains that, even before he was indicted, Rule 4.2 prohibited the government from using Gil as its agent to contact him because he had already retained counsel. According to Balter, the required remedy for these alleged violations of

Rule 4.2 is the suppression of these statements.

Local Rule 6(A) of the United States District Court for the District of New Jersey provides that the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall apply to attorneys practicing before the District Court, "subject to such modifications as may be required or permitted by federal statute, regulation, court rule or decision of law." D.N.J.R. 6(A). Rule 4.2 of the New Jersey Rules of Professional Conduct ("Rule 4.2" or "the Rule") provides:

In representing a client, a lawyer shall not communicate about the
subject of the representation with a party the lawyer knows to be
represented by another lawyer in the matter, unless authorized by
law to do so.

N.J.R.P.C. 4.2. The New Jersey Supreme Court has not considered the applicability of this Rule to prosecutors acting in the course of a pre-indictment investigation. "Where there is no definitive state court decision interpreting the rules as promulgated by the [New Jersey] Supreme Court, the federal Court will proceed to reach its own conclusion as to the appropriate application of the Rules of Professional Conduct." D.N.J.R. 6, Comment. In this case, the district court rejected Balter's argument on the theory that federal prosecutors are "authorized by law" to conduct pre-indictment investigations and that contact with a represented party in the course of such an investigation if therefore permitted under Rule 4.2.

Whether Rule 4.2 applies to government attorneys who communicate with a suspect as part of a pre-indictment criminal investigation is a question of first impression for this court, but we have no doubt that the district court's decision was correct. The language of Rule 4.2 and the opinions of the Appellate Division of the New Jersey Superior Court construing that rule support the view that the Rule is inapplicable to cases such as the one before us. Moreover, the overwhelming majority of circuits to have addressed this issue have also concluded that Model Rule of Professional Conduct 4.2, upon which New Jersey Rule 4.2 is based, is not applicable in such circumstances.

By its terms, Rule 4.2 applies to a "party" represented in a "matter." A "party" is necessarily a "party" to something. The Appellate Division of the New Jersey Superior Court has held that a criminal suspect is not a "party" until "after formal legal or adversarial

proceedings are commenced."  State of New Jersey v. Ciba-Geigy Corp., 589 A.2d 180, 183
(App. Div. 1991), appeal dismissed, 617 A.2d 1213 (N.J. 1992).  The court in Ciba-Geigyexplained that in the criminal context adversarial proceedings commence "by complaint or
indictment after investigation."  Id. at 185 (emphasis added).  We agree.

Moreover, even if a criminal suspect were a "party" within the meaning of the
Rule, pre-indictment investigation by prosecutors is precisely the type of contact exempted
from the Rule as "authorized by law."  New Jersey case law has explicitly exempted ordinary
pre-indictment investigation as within the "authorized by law" exception to the Rule.  State v.
Porter, 510 A.2d 49, 54 (App. Div. 1986).  Prohibiting prosecutors from investigating an
unindicted suspect who has retained counsel would serve only to insulate certain classes of
suspects from ordinary pre-indictment investigation.  Furthermore, such a rule would
significantly hamper legitimate law enforcement operations by making it very difficult to
investigate certain individuals.  Thus, even assuming that Gil contacted Balter at the direction
and under the supervision of government attorneys, the conduct of these attorneys was clearly
in the course of a legitimate pre-indictment investigation and was therefore "authorized by
law" under New Jersey Rule 4.2.

This conclusion is supported by the decisions of many other courts of appeals.
Indeed, with the exception of the Second Circuit, every court of appeals that has considered a
similar case has held, for substantially the same reasons as those noted above, that rules such
as New Jersey Rule 4.2 do not apply to pre-indictment criminal investigations by government
attorneys.  See, e.g., United States v. Powe, 9 F.3d 68 (9th Cir. 1993); United States v.
Ryans, 903 F.2d 731 (10th Cir.), cert. denied, 498 U.S. 855 (1990); United States v. Sutton,
801 F.2d 1346 (D.C. Cir. 1986); United States v. Dobbs, 711 F.2d 84 (8th Cir. 1983); United
States v. Weiss, 599 F.2d 730 (5th Cir. 1979);  But see United States v. Hammad, 858 F.2d
834 (2d Cir. 1988), cert. denied, 498 U.S. 871 (1990).  And even the Second Circuit has held
that ordinary pre-indictment investigation, such as that involved in this case, falls within the
"authorized by law" exception to the Rule absent some independent misconduct by the
prosecutors.  Hammad, 858 F.2d at 840.

We hold that New Jersey Rule 4.2 is inapplicable to contacts made by

prosecutors or their agents with criminal suspects in the course of a pre-indictment investigation. The district court therefore did not abuse its discretion in refusing to suppress the taped statements at issue here.

V.

A. Balter and DeJesus also contend that the district court violated Federal Rule of Evidence 404(b) by admitting certain of their statements that show, in their view, nothing more than a propensity to commit crimes. Trial court rulings under Rule 404(b) are reviewed for an abuse of discretion and may be reversed only when they are "clearly contrary to reason and not justified by the evidence." United States v. Bethancourt, 65 F.3d 1074, 1079 (3d Cir. 1995), cert. denied, 116 S.Ct. 1032 (1996) (citation omitted). This stringent standard has not been met here.

B. Balter objects to the admission of a statement that he made to Gil in a taped conversation that took place after the murder. After Gil mentioned to Balter that DeJesus wanted more money, Balter responded that if DeJesus "just disappears, then we'll have no f---- -- problems." Balter added, however, that "then we'll be involved with someone else again." SA. 234. Balter asserts that there was no proper basis for admitting this statement under Rule 404(b) and that it was admitted merely to show criminal propensity. He maintains that the statement has "no probative value," Balter Br. at 30 (emphasis in original), and is highly prejudicial. We disagree.

Under Rule 404(b), evidence of "other crimes, wrongs, or acts" may be admissible to show, among other things, "preparation, plan, and knowledge." The statement in question here is clearly relevant to show Balter's knowledge of the original plan and his involvement in the plan to cover up the murder. It casts significant doubt on his defense that he had nothing to do with the planning of the murder but was merely extorted to make payments after the fact by the other parties. Consequently, the district court's admission of this statement did not violate Rule 404(b).

C. DeJesus objects to the admission of testimony that he had boasted of previous experience as a murderer for hire. Gil was questioned about the conversation he had

with DeJesus when he first asked DeJesus if he would be interested in committing the murder for payment, and Gil testified that DeJesus acknowledged that he was interested. Gil added that DeJesus had "told [him] that he had done this type of thing before, . . . that he had not been doing it, but would do it because he needed the money," and "that he knew what he had to do, he had done it before and he knew what he had to do to kill [the victim]." SA. 81, 99.

DeJesus asserts that these statements had no probative value and were highly prejudicial. Again, however, we see no basis for reversing the trial judge's ruling. DeJesus's defense was that he was present at the murder scene but that he did not commit the murder. These statements were relevant to show, among other things, that he had a financial motive to commit the murder and the intent to do so. They also show preparation. DeJesus was trying to sell himself to Gil as a seasoned professional. His motive for getting involved and his intent in going to the scene are central to the charge of traveling interstate with the intent to commit murder for hire. Thus, the district court had a sound basis for concluding that these statements were admissible under Rule 404(b).

VI.

DeJesus contends that one of the prosecutors violated the rule of Doyle v. Ohio, 426 U.S. 610 (1976), during her summation by commenting on his post-arrest silence for the purpose of impeaching a subsequent exculpatory statement. We are troubled by the prosecutor's comments, but we are convinced that even if they were improper they constituted harmless error.

A. DeJesus was arrested in Aberdeen, North Carolina, by Postal Inspector William Johnson. Upon his arrest, DeJesus was read his Miranda rights, and he signed a written waiver of those rights. He then disclosed information about his identity and personal history, but he did not comment on the offenses for which he had been arrested. JA. 1455-57. He was taken to court in Winston-Salem for his initial appearance. JA. 1459-60. Upon arrival, he was given a copy of his indictment. After having the opportunity to read the indictment for approximately 25 minutes, DeJesus was brought before a magistrate judge. Although the record of the initial appearance has not been made a part of the record of this

case, the district court and the parties have all proceeded on the assumption that the initial appearance was conducted in conformity with Rule 5(c) of the Federal Rules of Criminal Procedure and that the magistrate judge therefore informed DeJesus that he was "not required to make a statement and that any statement made by [him could] be used against [him]." Fed. R. Crim. P. 5(c). See JA. 1575.

After the initial appearance, DeJesus was incarcerated, and two days later, he telephoned Inspector Johnson and tried to make a deal. JA. 1461. DeJesus said that he was afraid of Gil. He admitted that he drove with Gil to the homicide, but he maintained that Gil had actually done the shooting. He explained that he had testified in other similar cases and offered to help in any way he could. JA. 1462.

DeJesus complains specifically of two comments that the prosecutor made in summation. The prosecutor remarked:

> If DeJesus is totally innocent and in his mind all he did was he drove there and he was totally innocent, okay, then why didn't he as he's reading the indictment pop up and say wait a minute, wait a minute, they're saying I was the hit man here, I wasn't the hit man here, I just drove there. And if in his own mind he's totally innocent and he just drove there then why doesn't he just pop right up and say whoa, he knew what it meant to talk? But he waits two days, he waits two days to concocted [sic] his story. . .
>
> . He's trying to cut himself a break because he thinks that the Government doesn't know about Gus Gil because his name's not in [the indictment]. So he's saying to himself, he's sitting there pondering for two days well, I'll tell them, I'll blame it on Gus Gil,and I'll tell them I just drove then as the Government probably doesn't know about Gus Gil so let me, let me tell him and I'll cut myself a break.

JA 1543–44. The prosecutor also commented: "If [DeJesus] just drove and he's totally innocent, then why didn't he tell Inspector Johnson immediately? Why wait two days?" JA. 1557.

DeJesus's counsel immediately moved for a mistrial based on these comments. The court denied this motion but gave a limiting instruction that admonished the jury not to consider the portion of the prosecutor's argument that focused on DeJesus's silence at his preliminary hearing. Nonetheless, the court explained that the jury could consider the

chronology of events, so long as it did not consider DeJesus's silence. At the conclusion of the trial, DeJesus's counsel made a second motion for a mistrial, but this motion was also denied.

B. In Doyle v. Ohio, supra, the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause." The Court reasoned:

> The warnings mandated by [Miranda], as a prophylactic means of safeguarding Fifth Amendment rights, . . . require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. . . . Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 617-18 (citations and footnote omitted).

In attempting to defend the prosecutor's comments, the government points out that the present case differs from Doyle in that Doyle concerned a defendant's silence immediately after the administration of Miranda warnings whereas this case concerns DeJesus's silence during the two days following the (presumed) administration of warnings at his initial appearance. The government then notes that the Supreme Court has repeatedly declined to extend the rule of Doyle beyond its original scope. See Jenkins v. Anderson, 447 U.S. 231 (1979) (pre-arrest silence may be used to impeach exculpatory testimony at trial); Anderson v. Charles, 447 U.S. 404 (1979) (inconsistent statement given after arrest and Miranda warnings may be used to impeach exculpatory trial testimony); Fletcher v. Weir, 455 U.S. 603 (1981) (post-arrest silence may be used to impeach exculpatory testimony at trial

where no Miranda warnings were ever given).  Furthermore, the Court has held that there is
no Doyle violation where the trial court gives a curative instruction informing the jury that the
defendant's post-arrest silence is not evidence and cannot be used to infer guilt.  Greer v.
Miller, 483 U.S. 756 (1986).

We are not convinced that the government's suggested distinction is valid.  It
may be that a defendant's silence immediately after receiving Miranda warnings is more likely
to represent the exercise of Miranda rights than is a defendant's silence for an extended period
after the receipt of warnings, but the amount of time that elapsed in this case between the
(presumed) administration of warnings at the initial appearance and the defendant's telephone
call to Inspector Johnson -- two days -- was not great.  A defendant might well remain silent
for such a period in reliance on the belief, engendered by the warnings, that his silence could
not in any way be used against him.

The government also argues that this case is distinguishable from Doyle because
the prosecutor commented, not on DeJesus's silence, but on the timing of his call to Inspector
Johnson.  The government insists that the prosecutor merely noted that DeJesus had a two-day
opportunity to construct an alibi based on the indictment he had read.  However, we question
whether this argument can be distinguished from an argument that was expressly rejected in
Doyle.  There, the prosecution maintained that "the discrepancy between an exculpatory story
at trial and silence at the time of arrest gives rise to an inference that the story was fabricated
somewhere along the way, perhaps to fit within the seams of the state's case as it was
developed[.]"  Doyle 426 U.S. at 616.  But the Court refused to accept that argument.  Id. at
617-18.

C.  While we are doubtful that the present case can be distinguished from
Doyle, we find it unnecessary to decide this question, with respect to which there is apparently
no precedent that is directly on point.  Assuming that the prosecutor's imprudent comments
violated DeJesus's rights under Doyle, and assuming that they were not cured by the district
court's limiting instruction, any error was harmless beyond a reasonable doubt in light of the
overwhelming evidence admitted against DeJesus at trial.

The Supreme Court has held that "Doyle error fits squarely into the category of constitutional violations which [it] ha[s] characterized as `trial error.'"  Brecht v. Abrahamson, 507 U.S. 619, 629 (1993)(quoting Arizona v. Fulminante, 499 U.S. 279, 307 (1991)).  Such constitutional errors are subject to harmless error analysis under the "harmless-beyond-a-reasonable-doubt standard."  Brecht, 507 U.S. at 630 (citing Chapman v. California, 386 U.S. 18 (1967)).  Moreover, this court has previously recognized that Doyle violations are harmless beyond a reasonable doubt where the evidence against the defendant is "overwhelming." United States v. Dunbar, 767 F.2d 72, 76 (1985).

The evidence against DeJesus in this case, like the evidence against the defendant in Dunbar, was "overwhelming."  DeJesus was charged with knowingly and willfully travelling in interstate commerce and using and causing another to use a facility in interstate commerce with intent that a murder be committed.  JA 78, 84.  He admitted that he drove with Gil to Uneeda on the morning that Cohen was murdered.  JA. 419, 1585.  Therefore, the only remaining element the prosecution needed to prove was the requisite intent, and the evidence of this intent was enormous.

There was abundant evidence that DeJesus agreed to participate in the murder prior to its commission and that he took part in the planning and the prior unsuccessful attempt to kill Cohen.  Gil testified to every aspect of DeJesus's involvement.  He explained that Garcia had introduced them and that Gil had explained the job to DeJesus.  Gil testified that DeJesus was immediately interested because he said that he needed the money. SA. 81.  Gil recounted that he and DeJesus drove from that initial meeting to Uneeda so that he could show DeJesus where and how the murder was to take place.  SA. 59-62.  Gil described the failed attempt to kill Cohen at Uneeda on January 19, 1993, and the subsequent meeting with DeJesus and Balter at NPP where Balter told DeJesus that he wanted to make sure Cohen was dead and that it should look like a drug-related killing.  SA. 85-96.  Portions of taped conversations among Gil, Balter, Cutler, Garcia, and DeJesus corroborated much of Gil's testimony.  See e.g., SA. 232 (DeJesus "did this for [Balter] and now [Balter's] turning his back on me"); SA. 269 (Garcia found DeJesus for Gil); Id. (DeJesus "did it"); SA. 282-83

(DeJesus was looking for more money and had given some to Garcia "after the job"); SA. 234 (Gil had brought DeJesus to NPP).  It is also noteworthy that the prosecutor's challenged comments did not focus directly on the question whether DeJesus had the "intent that a murder be committed," as required by 18 U.S.C.  1958, but rather on the question whether DeJesus was the person who actually did the shooting, an element that was not required for conviction under that provision.

In light of overwhelming evidence that DeJesus travelled in interstate commerce with the intent that the murder of Cohen be committed, we hold that if the prosecutor's comments violated the rule of Doyle v. Ohio, supra, the error was harmless beyond a reasonable doubt.

## VII.

DeJesus argues that the government improperly shifted the burden of proof in its closing argument by commenting on defense counsel's failure to explain why DeJesus was at the scene of the crime at all if he was not the person who actually did the shooting.  The prosecutor stated: "Now what Mr. Brickfield [counsel for DeJesus] never tells you and he is the master of the uncompleted thought here.  What he never tells you is why he was there.  What was he doing there[?]"  JA 1645.  If this issue had been preserved, DeJesus would have to show that any error affected the jury's ability to judge the evidence fairly.  United States v. Young, 470 U.S. 1, 12 (1985).  However, DeJesus's attorney did not object to this comment at trial, and therefore DeJesus must show that the trial judge committed plain error in failing to strike this comment sua sponte.  We find no plain error.

DeJesus correctly points out that the prosecution may not comment on a defendant's failure to testify or to produce evidence.  See United States v. Drake, 885 F.2d 323 (6th Cir. 1989), cert. denied, sub nom. Clark v. United States, 495 U.S. 1033, and cert. denied, 493 U.S. 1049 (1990).  But the prosecutor did not do that; he commented on the failure of DeJesus's attorney to point to any evidence in the record supporting his theory of what occurred.  Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or to produce evidence

tending to show his innocence.  See United States v. Gotchis, 803 F.2d 74, 81 (2d Cir. 1986) (noting without reaching the issue that a court "would place especially undesirable constraints on the government by precluding . . . comments [on the absence of evidence to rebut its case] where defense counsel himself has suggested the alternative theory that the prosecutor then undertakes to debunk").

The prosecutor's comment attempted to focus the jury's attention on holes in the defense's theory.  Permitting this comment did not constitute plain error.

## VIII.

DeJesus argues that the government retreated from the theory contained in the indictment, i.e., that DeJesus was the person who actually did the shooting, and thereby created a prejudicial variance.  According to DeJesus, this occurred when the prosecutor stated, in rebuttal summation, that "whether or not he [DeJesus] was the shooter is not an issue here."  JA 1646.  DeJesus argues that he was substantially prejudiced because the timing of this alleged change in the government's strategy -- after the close of evidence and just before the case was given to the jury -- made it impossible for him to mold his defense strategy properly.

To prevail on this issue, DeJesus must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right.  United States v. Adams, 759 F.2d 1099, 1109 (3d Cir.), cert. denied, sub nom. Mustacchio v. United States, 474 U.S. 906, and cert. denied, sub nom. Alongi v. United States, 474 U.S. 906, and cert. denied, 474 U.S 971 (1985).  A variance occurs when "the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."  United States v. Castro, 776 F.2d 1118, 1121 (3d Cir.), cert. denied, 475 U.S. 1029 (1985).  To show prejudice, a defendant must generally show that the indictment either did not sufficiently inform him of the charges against him so that he could prepare his defense and not be misled or surprised at trial or that the variance created a danger that the defendant could be prosecuted a second time for the same offense.  Id. at 1123.

We are convinced that there was no prejudicial variance in this case.  In order

to show that DeJesus committed the violation of 18 U.S.C.    1958 and 2 that was charged in count I of the superseding indictment, the government was not obligated to show that DeJesus actually did the shooting, and accordingly the charging paragraph of this count did not tie the prosecution to this theory.  Instead, it merely alleged that DeJesus –– and the other defendants –– "knowingly and willfully travelled in and caused another to travel in interstate commerce and used and caused another to use a facility in interstate commerce with intent that a murder be committed."  J.A. 84.  Although a later paragraph of this count did allege that "DeJesus attempted to kill Robert cohen by shooting him several times with a pistol," J.A. 88, DeJesus and his attorney undoubtedly understood that the charge set out in count I did not require proof that DeJesus did the shooting, and thus we see no basis for concluding that the alleged switch in the government's theory caused them to be surprised, misled, or prejudiced in the preparation of DeJesus's defense.

In any event, the record does not support DeJesus's argument that the prosecution abandoned its theory that DeJesus did the shooting.  Instead, the prosecutor's statement was merely a correction of defense counsel's misstatement of the law, i.e., that "the only issue with respect to [DeJesus] was he was the shooter as charged? Was he the shooter as Gus Gil has testified[?]"  JA 1613.  The prosecutor responded by stating:

> The point being whether or not he was the shooter, we don't concede for a minute that DeJesus was not the shooter, whether or not he was the shooter is not an issue here, the issue is did he travel in interstate commerce with the intent that a murder be committed?

JA 1646.  Although the district court found this to be a "fair response" to defense counsel's misstatement of the law, the court allowed defense counsel an extra two minutes to address the jury.  In surrebuttal, the government restated its contention that the evidence was sufficient to prove, beyond a reasonable doubt, that DeJesus was the shooter.  JA 1658-59.  Under these circumstances, any variance between the facts alleged in the superseding indictment and those proved at trial was not prejudicial to DeJesus.

IX.

DeJesus contends that the district court should have excluded a high school yearbook photograph of him under Federal Rule of Evidence 403. A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403. United States v. Pelullo, 14 F.3d 881, 888 (3d Cir. 1994). "If judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.), cert. denied, 488 U.S. 910 (1988).

The prosecution offered the yearbook photo to corroborate the testimony of an eyewitness, Lisa Allen, who described the shooter as having straight black bangs and a moustache. When he was arrested, DeJesus had a moustache, but at the time of trial, he had neither a moustache nor straight black bangs. In the yearbook photo, which had been taken six years earlier when DeJesus was 16, he had both straight black bangs and a moustache.

DeJesus suggests that the photograph had little probative value for the purpose of establishing his appearance at the time of the shooting, six years after the picture was taken, and he argues that the photo created an undue danger of unfair prejudice because it was old and depicted him when he was "a mere adolescent." DeJesus Br. at 43.

We hold that the district court did not abuse its discretion in concluding that the probative value of the photo outweighed the potential unfair prejudice. A trial judge could reasonably conclude that a jury was well capable of assessing the likelihood that the six-year-old photo accurately depicted DeJesus's appearance at the time of the shooting.

X.

Finally, DeJesus argues that the cumulative effect of errors allegedly committed at trial require a new trial. United States v. Williams, 739 F.2d 297 (7th Cir. 1984). In light of our conclusion that the sole potential error before us was harmless, we reject this argument.

XI.

For the reasons stated above, we affirm the judgment of the district court.

_____