UNITED STATES of America, Plaintiff-Appellee,

v.

Alfred Lee APODACA, Defendant-Appellant.

No. 74–1595.

United States Court of Appeals, Tenth Circuit.

Argued May 2, 1975.

Decided Aug. 22, 1975.

Louis A. Mankus, Cheyenne, Wyo., for defendant-appellant.

Richard A. Stacy, Asst. U. S. Atty. (Clarence A. Brimmer, U. S. Atty., Tosh Suyematsu, Asst. U. S. Atty., Cheyenne, Wyo., on the brief), for plaintiff-appellee.

Before HILL, SETH and McWILLIAMS, Circuit Judges.

HILL, Circuit Judge.

Alfred Lee Apodaca was convicted by a jury in the United States District Court for the District of Wyoming of (1) making a destructive device without paying a Making Tax, a violation of 26 U.S.C. §§ 5861(f) and 5871, and 18 U.S.C. § 2; (2) possessing a destructive device not registered in the National Firearms Registration and Transfer Record, a violation of 26 U.S.C. §§ 5861(d) and 5871, and 18 U.S.C. § 2; and (3) destroying, by means of an explosive, a vehicle owned

by an organization receiving federal financial assistance, a violation of 18 U.S.C. §§ 844(f) and 2. His conviction stems from the December 8, 1973, dynamite-bombing of a Fremont County sheriff's patrol car in Riverton, Wyoming.

A preliminary hearing was held on April 8, 1974. At that time Roberta Jean Hernandez, the government's key witness, testified that appellant and one Ronnie Jasch picked her up at 9:00 p.m. on December 7, 1973, to take a ride in appellant's new car; that while they were riding around Jasch said he knew where some dynamite was located and suggested that they "blow up a cop car"; that they drove to a house belonging to appellant's father where appellant obtained some dynamite and a fuse; that at 1:45 a.m. on December 8, 1973, they parked approximately one-half block from the Fremont County Undersheriff's house; that she remained in the car but that Jasch took the dynamite and that he and appellant walked away in the direction of the Undersheriff's house; and that they returned a few minutes later, without the dynamite, and that Jasch stated it would take a while for it to go off.

Hernandez also testified that she was frightened because, approximately one month before the preliminary hearing, appellant said he would blame her if she testified against him and that she "wouldn't make it to court to testify." Accordingly, a condition of appellant's subsequent release on bail was that he could "not contact, threaten, or communicate with Roberta Jean Hernandez . . . or any other prosecution witness in this case."

A few minutes before trial was to begin on August 7, 1974, Hernandez, who had been subpoenaed as a government witness, informed the assistant United States attorney that she did not want to testify against appellant because they

had been married three days earlier. She produced a certificate of marriage to verify her claim. During the course of the trial, however, the government did call her as a witness. Appellant objected on the grounds of the husband-wife privilege. The trial court determined that the marriage was a fraud on the court, entered into in violation of appellant's condition of bail and for the purpose of preventing the government from producing a material witness, and allowed the government to call her. Compelled to testify, Hernandez took the stand and attempted to repudiate her preliminary hearing testimony.

Appellant contends that the trial court erred in compelling Hernandez to testify over his assertion of the husband-wife privilege. The government, on the other hand, argues that the privilege does not apply here because Hernandez' testimony either related to acts she observed rather than to privileged communications, concerned communications made before the marriage relationship was entered into, or concerned communications made in the presence of a third party.[1]

■■ Although the government's assertions are true, it misapprehends the nature of the privilege in issue here. It proffers several valid exceptions to the privilege barring the testimony of one spouse as to confidential communications of the other. However, the federal courts recognize two distinct privileges arising out of the marital relationship. The first, as previously noted, bars the testimony of one spouse as to confidential communications of the other. See, e. g., Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); 3 Jones on Evidence § 21:4 (6th ed. 1972). The second bars one spouse from testifying adversely to the other unless the other spouse consents.[2] It is the latter privilege that has been asserted here.

---

1. Under the new uniform Rules of Evidence, not yet in effect at the time of this trial, Hernandez' testimony would be admissible. *See* F.R.Evid., Rules 501 and 601.

2. *See, e. g., United States v. Harper,* 450 F.2d 1032 (5th Cir. 1971); *United States v. Moor-*

*man,* 358 F.2d 31 (7th Cir. 1966), *cert. den'd,* 385 U.S. 866, 87 S.Ct. 127, 17 L.Ed.2d 93. 3 Jones on Evidence § 20:47 (6th ed. 1972) notes that the "competency" of one spouse to testify for or against the other is, in the federal courts, stated in terms of privilege.

■ Relying on the trial court's determination that the marriage was a fraud, an exception to the husband-wife privilege, *see, e. g., Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), the government asserts that the privilege is nonetheless inapplicable and that Hernandez was a competent witness. We agree. The evidence in the record discloses that Hernandez, afraid because of threats made against her by appellant, inculpated him at the preliminary hearing; that he was released on bail by Judge Kerr on the specific condition that he not contact Hernandez; that Hernandez saw appellant only a couple of times after that but that they were married only three days before trial; and, that Hernandez told the assistant United States attorney, a few minutes before trial, that her preliminary hearing testimony was true but thereafter attempted to refute such testimony. Under the circumstances disclosed by the record before us, we hold that appellant may not avail himself of the asserted privilege because it is based upon a fraudulent, spurious marriage that was not entered into in good faith. *See Lutwak v. United States, supra. See also* Annot.: Competency Of Spouse As Witness, 97 L.Ed. 707 (1953); 2 Wharton's Criminal Evidence § 386 (13th ed. 1972); 2 Wright, Federal Practice And Procedure § 405 (1969); 3 Orfield, Criminal Procedure Under The Federal Rules (1966); 8 Wigmore on Evidence § 2230 (McNaughton rev. 1961); 3 Jones on Evidence § 20:52 (6th ed. 1972).[3]

Appellant also attacks his conviction under 18 U.S.C. § 844(f), which provides, in part:

Whoever maliciously damages or destroys, or attempts to damage or de-

stroy, by means of an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed, or used by, or leased to, the United States, any department or agency thereof, or any institution or organization receiving Federal financial assistance shall be imprisoned for not more than ten years, or fined not more than $10,000, or both . . . .

He argues that the destruction of the Fremont County Undersheriff's patrol car does not give rise to federal jurisdiction because the vehicle was not possessed by an organization receiving federal financial assistance within the meaning of the statute. We disagree.

■ The State of Wyoming, through its Governor's Planning Committee on Criminal Administration (Committee), was the recipient in 1972 and 1973 of federal financial assistance in the form of Law Enforcement Assistance Administration (LEAA)[4] grants under the provisions of the Crime Control Act of 1973 and its predecessor, the Omnibus Crime Control And Safe Streets Act of 1968. *See* 42 U.S.C. § 3701 *et seq.* The Fremont County sheriff's office, acting through Fremont County,[5] applied to the Committee for, and received, financial assistance in the years 1972 and 1973. Since the patrol car in question was titled to (and thus owned by) Fremont County, and was possessed and used by the Fremont County sheriff's office, the requirements of 18 U.S.C. § 844(f) have been met.

Appellant, however, contends that Fremont County still did not receive federal financial assistance because "[m]oney came from the Federal Government, into a State account, and then was dispursed [sic] by State Warrant to Fremont Coun-

---

**3.** We are bound to accept the trial court's findings regarding the nature of the marriage. These findings are supported by the evidence and are not clearly erroneous.

**4.** The LEAA was created by the Omnibus Crime Control And Safe Streets Act of 1968 to administer a federal grant program to the states for various law enforcement purposes.

**5.** The Fremont County sheriff's office was unable to make a direct application to the Committee for financial assistance because 42 U.S.C. § 3734 requires the Committee to "receive applications for financial assistance from units of general local government and combinations of such units." Fremont County, a unit of general local government as defined in 42 U.S.C. § 3781(d), was authorized to make the application.

572

ty." In other words, he asserts that the funds in question ceased to be federal in nature upon their receipt by the Committee on behalf of the State of Wyoming. We find no merit in this argument. Instead, we believe that the Committee serves as a conduit of federal funds and not as a distributor of state funds. Upon receiving federal funds the Committee places them in a state account where they are identified as federal funds by the Committee's federal fund number. When a grant is made to an applicant a state warrant, bearing the Committee's federal fund number, is prepared, payable to the applicant. Use of a state warrant under these circumstances is merely a bookkeeping device to channel funds from a separate account maintained for federal funds to the actual recipient of the federal money.

This position is supported by the stated purpose of the Crime Control Act of 1973, which is expressed in 42 U.S.C. § 3701:

> Congress finds . . . that crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively.

> It is therefore the declared [purpose] of the Congress to assist State and local governments in strengthening and improving law enforcement and criminal justice at every level by *national assistance.* It is the purpose of this chapter to . . . authorize grants to States and *units of local government* in order to improve and strengthen law enforcement and criminal justice.[6] [Emphasis added.]

 Relying upon the fact that the destroyed patrol car was purchased for the Fremont County sheriff's office out of its operating budget by a Fremont County warrant and not with any of the

federal funds in issue, a point conceded by the government, appellant contends there is no federal jurisdiction because 18 U.S.C. § 844(f) applies only to the specific items purchased with the federal funds. We cannot agree. The clear and unambiguous language of the statute provides that it applies to *any* property owned, possessed, used by or leased to any organization receiving federal financial assistance.

Affirmed.

---

**6.** *See also* the views of Senator Scott in S.Rep. No.1097, 90th Cong., 2nd Sess. 2268 (1968): "Under this approach, *Federal financial assistance to State and local law enforcement would be channeled through 'State planning agencies'* created or designated by the Governors of the several states. These funds would be allocated by the State agencies to State and local law enforcement activities pursuant to current comprehensive plans which must be approved annually by the Federal Law Enforcement Administration." [Emphasis added.]