FILED
United States Court of Appeals
Tenth Circuit

April 5, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOEL S. ELLIOTT,

    Defendant - Appellant.

No. 15-8138
(D. Wyo.)
(D.C. No. 1:15-CR-00042-SWS-1)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

In 2014, Mr. Joel Elliott bombed a building owned by Sheridan County, leading to his conviction on charges that included arson of a building owned or possessed by an entity receiving federal funds. *See* 18 U.S.C. § 844(f)(1)-(2) (2012).[1] Mr. Elliott appeals, raising issues about how the government investigated the bombing and whether the building's occupant was receiving federal funds at the time of the bombing.

---

[*] Our order and judgment does not constitute binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[1] Mr. Elliott was also convicted of using a firearm during and in relation to a crime of violence, possessing an unregistered firearm, and making a false declaration to a grand jury.

The government obtained evidence by using an undercover informant (Mr. Robert Weber) to elicit and record incriminating admissions from Mr. Elliott. At that time, Mr. Elliott was allegedly represented by an attorney on the matter under investigation. In light of the alleged legal representation, Mr. Elliott alleges an ethical violation and argues that his incriminating statements should have been suppressed. We disagree for two reasons:

1. Mr. Elliott's argument is waived. At a minimum, Mr. Elliott forfeited the argument in district court and then waived the argument on appeal by failing to request plain-error review.

2. His argument fails on the merits. Even if we credit Mr. Elliott's factual allegations, the Assistant U.S. Attorney did not violate an ethical rule.[2]

Mr. Elliott challenges not only the ethics of the Assistant U.S. Attorney's conduct but also the applicability of the federal statute that criminalizes arson of a building owned or possessed by an entity receiving federal funds. The building that Mr. Elliott bombed was occupied by the Sheridan County Attorney's Office and owned by Sheridan County. When Mr. Elliott bombed the building, the county attorney's office was not receiving federal funds, but the county itself was. In our view, this funding triggered the criminal statute for arson of a building owned or possessed

---

[2]  In explaining that Mr. Elliott's argument fails on the merits, we do not suggest that we would have reversed here even though Mr. Elliott had waived his appeal point. We simply explain that the appeal point suffers two defects: It is both (1) waived and (2) invalid.

by an entity receiving federal funds. As a result, we reject Mr. Elliott's challenge to the applicability of the arson statute.

## I. Ethical Conduct

Mr. Elliott urges use of the Court's supervisory power to order suppression of his incriminating statements, claiming that an Assistant U.S. Attorney violated state ethical rules in authorizing the undercover investigation.[3] We reject this contention for two reasons. First, at a minimum, Mr. Elliott forfeited his present argument in district court and subsequently waived the argument on appeal by failing to request plain-error review. Second, Mr. Elliott's argument fails on the merits because the Assistant U.S. Attorney's alleged conduct would not have violated state ethical rules.

### 1. Waiver

In district court, Mr. Elliott filed a motion to suppress and supporting memorandum that relied on the Fifth Amendment, omitting any mention of an ethical rule or an ethical violation. At a hearing on the motion to suppress, Mr. Elliott proffered an excerpt of the American Bar Association's *Annotated Model Rules of Professional Conduct*. The

---

[3] In district court, Mr. Elliott asserted that he had known that Mr. Weber was acting as a government agent. The court rejected this assertion. In this appeal, Mr. Elliott does not address whether he had known that Mr. Weber was working for the government.

3

government objected based on relevance. Responding to the objection, Mr. Elliott made two references to the Model Rules:

1. "I would direct your attention to page 432 and following [of the excerpt]. It talks about statement, federal prosecutions, and there's some case law citations there that talk about represented criminal defendants in other matters and so forth. So I'm offering that to the Court . . . as some authority that the Court can certainly take a look at if there are questions related to those issues."

2. "Model Rule 4.2 and the annotations that are contained on page 432 do have some applicability here."

R. vol. III, at 203, 208. These are the only references to an ethical rule that Mr. Elliott made in district court.

On appeal, Mr. Elliott drops his Fifth Amendment argument for suppression. Instead, Mr. Elliott argues that his incriminating statements should have been suppressed because the Assistant U.S. Attorney had violated state ethical rules.

The threshold issue is whether Mr. Elliott failed to preserve this argument in district court. Appellants can fail to preserve an argument through forfeiture or waiver. Forfeiture occurs when the appellant fails to timely and adequately present the argument in district court. *See United States v. Olano*, 507 U.S. 725, 733 (1993). Waiver can occur when the appellant intentionally relinquishes or abandons the argument in district court. *See id*. At the least, Mr. Elliott failed to timely and adequately present his ethical argument when urging the district court to suppress the

4

evidence; thus, at a minimum, the present argument was forfeited in district court.[4] *See Ave. Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 884 (10th Cir. 2016).

We can consider forfeited arguments under the plain-error standard. *Id.* at 885. But Mr. Elliott has not asked for plain-error review of his argument. Therefore, even if Mr. Elliott had merely forfeited his argument in district court, he has waived the argument while on appeal. *See*

---

[4]    Mr. Elliott may even have committed two separate waivers of the argument in district court.

First, Mr. Elliott may have waived the argument in district court by failing to mention a potential ethical violation in his motion to suppress. This omission implicates Federal Rule of Criminal Procedure 12(c)(3). In two unpublished opinions, we have held that under Rule 12(c)(3), waiver occurs when a defendant fails to adequately present an argument in a motion to suppress. In these cases, we found waivers without determining whether the omission was intentional or inadvertent. *See United States v. Shrader*, No. 15-5073, 2016 WL 4497984, at *4 (10th Cir. Aug. 26, 2016) (unpublished); *United States v. Franco*, 632 F. App'x 961, 963-64, 963 n.1 (10th Cir. 2015) (unpublished). *But see United States v. Soto*, 794 F.3d 635, 648-52, 655 (6th Cir. 2015) (concluding that under the 2014 amendments to Federal Rule of Criminal Procedure 12, an untimely pretrial motion listed in Rule 12(b)(3) no longer constitutes a waiver); *United States v. Sperrazza*, 804 F.3d 1113, 1119 (11th Cir. 2015) (same).

Second, Mr. Elliott may have intentionally abandoned the ethical argument later in the proceedings. During the hearing on the motion to suppress, the government challenged Mr. Elliott to flesh out his allegation of an ethical violation, and Mr. Elliott failed to do so. This failure arguably constituted an intentional abandonment of the argument.

But we need not decide whether Mr. Elliott waived his argument in district court. Even if Mr. Elliott had only forfeited the argument in district court, he waived the argument on appeal by failing to request plain-error review. *See* pp. 4-7.

*McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) ("[E]ven if [the appellant's] arguments were merely forfeited before the *district court*, her failure to explain in her opening appellate brief . . . how they survive the plain error standard waives the arguments in *this* court.").

In the appeal, the government has not argued forfeiture or waiver. Thus, the government has arguably waived the issue of Mr. Elliott's waiver. *See, e.g.*, *United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006). Nevertheless, we have discretion to raise Mr. Elliott's waiver sua sponte. *See United States v. Rodebaugh*, 798 F.3d 1281, 1314 (10th Cir. 2015) ("[T]he 'waiver of the waiver' principle is discretionary, not mandatory.").

In deciding whether to raise this issue sua sponte, we may weigh the relative harm from each party's failure to adequately present an argument. *See id.* at 1314-17 (assuming for the sake of argument that the government forfeited or waived the appellant's forfeiture and then comparing the consequences of each party's failure to adequately present an argument). We conclude that Mr. Elliott's failure created greater harm by impeding the development of the record on key factual issues. We therefore raise Mr. Elliott's waiver sua sponte.

Mr. Elliott's argument depends on five alleged facts:

1.    The Assistant U.S. Attorney authorized the undercover investigation of the bombing.

2. Mr. Weber served as the Assistant U.S. Attorney's agent during the investigation.

3. Mr. Elliott was represented by counsel on the matter under investigation.

4. The Assistant U.S. Attorney knew that Mr. Elliott was represented by counsel on the matter under investigation.

5. Mr. Weber communicated with Mr. Elliott about the matter under investigation.

On appeal, Mr. Elliott urges us to accept these alleged facts.

Most of these factual issues arose in district court, but only in the context of an alleged Fifth Amendment violation. In that context, the parties barely discussed the Assistant U.S. Attorney's role in the investigation and the district court did not address the scope of Mr. Elliott's legal representation.

Mr. Elliott had an opportunity to develop the record concerning these factual issues. For example, in the hearing on the motion to suppress, the government invited Mr. Elliott to develop his argument regarding a violation of the ethical rules: "If [Mr. Elliott is] making a professional responsibility argument, that's a whole nother subject, and . . . I will represent to the Court that it's one that the Government is more than willing to take on." R. vol. III, at 204. If Mr. Elliott had taken this invitation, the district court could have elicited evidence on these factual issues. But Mr. Elliott declined, leaving us with a deficient appellate

record. By contrast, the government's omission did not affect the appellate record, which makes Mr. Elliott's waiver readily apparent.

\* \* \*

In our view, Mr. Elliott has waived his argument for suppression based on an ethical violation. Thus, even if his argument were meritorious, we would not reverse.

## 2.    Discretion to Independently Affirm on the Merits

Having rejected Mr. Elliott's argument based on waiver, we could stop our analysis. But we need not do so. Instead, we may provide an additional, independent basis for affirming: His argument fails on the merits.

The Supreme Court has held that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *accord Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary."); *see also Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) ("Waiver . . . binds only the party, not the court.").

We have frequently exercised this discretion by rejecting appellate challenges on the merits even after finding the appellate challenges

forfeited or waived. *See, e.g.*, *United States v. Norman T.*, 129 F.3d 1099, 1106 & n.3 (10th Cir. 1997); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 877-78 (10th Cir. 2004); *United States v. Luke-Sanchez*, 483 F.3d 703, 706-07 (10th Cir. 2007); *United States v. Pursley*, 577 F.3d 1204, 1228-29 (10th Cir. 2009); *United States v. Cooper*, 654 F.3d 1104, 1127-29 (10th Cir. 2011); *Harvey v. United States*, 685 F.3d 939, 946 (10th Cir. 2012); *Fulghum v. Embarq Corp.*, 785 F.3d 395, 408-09 (10th Cir.), *cert. denied*, 136 S. Ct. 537 & 136 S. Ct. 538 (2015); *Mitchell v. Comm'r*, 775 F.3d 1243, 1248-49 n.3 (10th Cir. 2015); *Lexington Ins. Co. v. Precision Drilling Co.*, 830 F.3d 1219, 1224-25 (10th Cir. 2016) (Bacharach, J., concurring, joined by McHugh, J.); *Rife v. Okla. Dep't of Pub. Safety*, 846 F.3d 1119, 1135 (10th Cir. 2017). We elect to do the same here, independently affirming on the merits even though Mr. Elliott has waived his challenge.

In deciding whether to independently reject Mr. Elliott's challenge on the merits, we are guided here by two factors:

1. Would rejection on the merits serve the public interest?

2. May we reject the argument, with certainty, purely as a matter of law?[5]

---

[5] In other cases, different factors may affect whether to independently reject a waived argument on the merits.

9

We first examine whether rejecting the waived argument on the merits would serve the public interest. *See Carlson v. Green*, 446 U.S. 14, 17 n.2 (1980) (deciding an unpreserved argument on the merits because doing so would serve the interests of judicial administration); *Bylin v. Billings*, 568 F.3d 1224, 1231 (10th Cir. 2009) (indicating that we may "consider issues not raised or argued in the district court" when the "public interest is implicated"); *Sussman v. Patterson*, 108 F.3d 1206, 1210 (10th Cir. 1997) (deciding to reach the merits of a forfeited issue, in part because of "the important public policy concerns raised by the issue").

The ethical issue here involves a state's "no-contact rule." A no-contact rule prohibits an attorney from knowingly communicating with individuals who are known to be represented by counsel. Caleb Mason, *The Police-Prosecutor Relationship & the No-Contact Rule: Conflicting Incentives After* Montejo v. Louisiana *&* Maryland v. Shatzer, 58 Clev. St. L. Rev. 747, 755 (2010). Some version of this rule has long existed in every state. *See* Frank O. Bowman, III, *A Bludgeon by Any Other Name: The Misuse of "Ethical Rules" Against Prosecutors to Control the Law of the State*, 9 Geo. J. Legal Ethics 665, 722 n.265 (1996). Uncertainty regarding the scope of these rules can chill prosecutors' use of legitimate investigative techniques. *See* John G. Douglass, *Jimmy Hoffa's Revenge: White-Collar Rights Under the McDade Amendment*, 11 Wm. & Mary Bill Rts. J. 123, 137-38 & 138 n.117 (2002). By rejecting Mr. Elliott's waived

10

argument on the merits, we can mitigate this chilling effect within our circuit. Doing so will serve the public interest.

The second factor is whether we may reject the waived argument, with certainty, purely as a matter of law. *See United States v. Lyons*, 510 F.3d 1225, 1238 (10th Cir. 2007); *United States v. Jarvis*, 499 F.3d 1196, 1202 (10th Cir. 2007).

As discussed above, Mr. Elliott's argument depends on five alleged facts. *See* pp. 6-7, above. If we assume that these alleged facts are true, the resulting issue would be purely legal: Under the no-contact rule, could a prosecutor who knows that a suspect is represented by counsel on a particular matter use an undercover informant to elicit incriminating admissions from the suspect on that matter? As discussed below, the answer is clearly yes. *See* pp. 11-22, below. This consideration favors rejecting Mr. Elliott's argument based on the merits as well as on waiver.

Considering the two factors, we conclude that it is appropriate to reject Mr. Elliott's waived argument on the merits.

### 3. Rejecting Mr. Elliott's Argument on the Merits

On the merits, we conclude that the Assistant U.S. Attorney did not commit an ethical violation.

As a general rule, an Assistant U.S. Attorney is bound by the ethical rules of the state where he or she practices. 28 U.S.C. § 530B(a) (2012). When the government was investigating Mr. Elliott in 2015, the Assistant

11

U.S. Attorney was practicing in the State of Wyoming. Consequently, he was bound by Wyoming's ethical rules as they existed in 2015.

Rule 4.2 of Wyoming's ethical rules was a no-contact rule. It stated:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person or entity the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Wyo. Rules of Prof'l Conduct R. 4.2 (2015). The text of Wyoming's version of Rule 4.2 was nearly identical to the text of the American Bar Association's version. The sole difference was that the ABA's version used the word "person" rather than the phrase "person or entity." *See* Model Rules of Prof'l Conduct R. 4.2 (2015).

As the text of Wyoming's version of Rule 4.2 rule indicates, this rule generally prohibited attorneys from knowingly communicating with a "person" represented by another attorney about the subject of the representation. Wyo. Rules of Prof'l Conduct R. 4.2 (2015). This prohibition applied even if the communication had taken place through an intermediary. *See* Wyo. Rules of Prof'l Conduct R. 8.4(a) (2015). But an exception existed for communications "authorized by law." Wyo. Rules of Prof'l Conduct R. 4.2 (2015).

The issue here is whether Rule 4.2 prohibited the Assistant U.S. Attorney from using an undercover informant to elicit incriminating admissions from Mr. Elliott, who was allegedly represented by an attorney

12

on the matter under investigation. We answer "no" because the "authorized by law" exception applied.

In addressing this issue, we are guided by

- the historical development of Wyoming's version of Rule 4.2,

- the ways that other courts have interpreted Rule 4.2 and its predecessor, Disciplinary Rule 7-104(A)(1) of the ABA's Model Code of Professional Responsibility, and

- policy considerations, previously recognized by our circuit, supporting the use of undercover informants in pre-indictment investigations.

Because the issue involves Wyoming law, we examine the decisions of the Wyoming Supreme Court. *ACE Fire Underwriters Ins. Co. v. Romero*, 831 F.3d 1285, 1289 (10th Cir. 2016). That court has not yet interpreted the "authorized by law" exception under Wyoming's current version of Rule 4.2. Thus, we must predict how the Wyoming Supreme Court would interpret the exception. *Balknap v. IASIS Healthcare*, 844 F.3d 1272, 1295 (10th Cir. 2017). To make this prediction, we follow Wyoming's rules of statutory construction and all relevant sources that would inform the Wyoming Supreme Court's decision. *See United States v. Ruiz*, 589 F.3d 1310, 1313-14 (10th Cir. 2009) (following state rules of construction); *Rock Island Improvement Co. v. Helmerich & Payne*, 698 F.2d 1075, 1079 (10th Cir. 1983) (using all relevant sources that would inform the state supreme court's decision).

In interpreting a prior version of Rule 4.2, the Supreme Court of Wyoming has examined not only the text and commentary of the rule, but also the ways that other courts and secondary sources understand Rule 4.2 and Disciplinary Rule 7-104(A)(1). *See Strawser v. Exxon Co., U.S.A.*, 843 P.2d 613, 617-23 (Wyo. 1992). To predict how the Wyoming Supreme Court would interpret the current version of Rule 4.2, we follow the same approach.

Wyoming's version of Rule 4.2 has generally tracked the American Bar Association's version, which also uses the word "person." *See* Model Rules of Prof'l Conduct R. 4.2 (2015). Both versions closely resemble the ABA's earlier version of the no-contact rule, Disciplinary Rule 7-104(A)(1) of the ABA's Model Code of Professional Responsibility. *See* Model Code of Prof'l Responsibility DR 7-104(A)(1) (1969). Unlike Rule 4.2, Disciplinary Rule 7-104(A)(1) prohibited communications with a "party" rather than a "person." *Id.* But like Rule 4.2, Disciplinary Rule 7-104(A)(1) contained an exception for communications "authorized by law." *Id.*

In interpreting Disciplinary Rule 7-104(A)(1), many courts held that the rule did not apply when a prosecutor used an informant, prior to indictment, to communicate with a suspect. *See, e.g.*, *United States v. Cope*, 312 F.3d 757, 773 (6th Cir. 2002) (stating that the defendant "has cited no authority, nor have we found any, to support his contention that

14

the government's working with confidential informants to elicit incriminating information from a represented defendant violates" Disciplinary Rule 7-104(A)(1)). Some courts, like ours, arrived at this holding based largely on the rule's limitation to communications with a "party." *See, e.g.*, *United States v. Ryans*, 903 F.2d 731, 739-40 (10th Cir. 1990); *accord State v. Smart*, 622 A.2d 1197, 1214 (N.H. 1993). Other courts relied, at least in part, on the exception for communications "authorized by law." *See, e.g.*, *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988); *State v. Lang*, 702 A.2d 135, 137 (Vt. 1997); *see also United States v. Heinz*, 983 F.2d 609, 618 (5th Cir. 1993) (Parker, J., concurring in part and dissenting in part) (asserting that "[t]he use of informants to gather evidence against a suspect will *generally, if not almost always*, fall within the ambit of the 'authorized by law' exception to" Disciplinary Rule 7-104(A)(1)).

In 1983, the ABA replaced Disciplinary Rule 7-104(A)(1) with Rule 4.2 of the Model Rules of Professional Conduct. *See* ABA Ctr. for Prof'l Responsibility, *A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982-2013*, at vii, 555, 558 (Art Garwin ed., 2013). The new rule was virtually identical to the old rule. *Id.* at 558. Like its predecessor, Rule 4.2 generally prohibited attorneys from communicating with a "party" about the subject of the representation. Model Rules of Prof'l Conduct R. 4.2 (1983). And like its predecessor,

15

Rule 4.2 contained an exception for communications "authorized by law." *Id.*

Interpreting Rule 4.2, most courts continued to hold that the rule did not apply when prosecutors used informants to communicate with represented suspects. *United States v. Balter*, 91 F.3d 427, 436 (3d Cir. 1996) (Alito, J.) (stating that virtually every federal appellate court to address the issue had held that pre-indictment criminal investigations did not violate Rule 4.2 because (1) the rule was limited to communications with a "party" or (2) such communications were "authorized by law"); Colo. Bar Ass'n Ethics Comm., Formal Op. 96: Ex Parte Communications with Represented Persons During Criminal and Civil Regulatory/Investigations and Proceedings, 23 Colo. Law. 2297, 2298 (1994) ("Most courts interpreting Rule 4.2 or its predecessor [Disciplinary Rule] 7-104(A)(1) have reached the conclusion that [the use of informants is] 'authorized by law.'").

In 1995, the ABA amended the rule, changing the word "party" to "person." Model Rules of Prof'l Conduct R. 4.2 (1995). Eleven years later, Wyoming followed suit, amending Rule 4.2 to cover persons or entities rather than parties. Wyo. Rules of Prof'l Conduct R. 4.2 (2006).

Mr. Elliott seizes on this change. He argues that the change broadened the rule, prohibiting prosecutors from using informants to

16

communicate with represented suspects at the investigation stage. We disagree.

When amending the rule, the ABA indicated that the change from "party" to "person" would not create new ethical constraints for prosecutors using informants to communicate with represented suspects. Shortly before the amendment, the ABA issued a formal opinion, which acknowledged the case law holding that the use of informants fell within the "authorized by law" exception:

> [T]he Committee recognizes that there is a body of decisional law that in effect concludes that the public interest in investigating crime may outweigh the interests served by [Rule 4.2] in the criminal context, at least where the contacts are made with represented persons who have been neither arrested nor formally charged, and the contacts are made by undercover agents or informants and not by the government lawyers themselves (or by agents acting so closely under the lawyers' direction as to be their "alter egos"). Accordingly, the Committee believes that so long as this body of precedent remains good law, it is appropriate to treat contacts that are recognized as proper by such decisional authority as being "authorized by law" within the meaning of that exception stated in [Rule 4.2].

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 95-396, at 11 (1995). The ABA then amended the rule's commentary "to acknowledge the case law that ha[d] limited the application of 'anti-contact' prohibitions in the context of pre-indictment, non-custodial contacts, principally by 'undercover' investigative agents." ABA Ctr. for Prof'l

17

Responsibility, *A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982-2013*, at 559 (Art Garwin ed., 2013).

Wyoming took the same approach, commenting that the "authorized by law" exception "may" include the use of "investigative agents" before criminal proceedings begin. Wyo. Rules of Prof'l Conduct R. 4.2 cmt. 5 (2015). This commentary signaled that undercover criminal investigations "may" have been authorized by law. But were they? We answer "yes" based on prevailing case law and policy considerations favoring the use of informants prior to an indictment.

In *United States v. Ryans*, we held that prosecutors could use informants to communicate with represented suspects even though Disciplinary Rule 7-104(A)(1) prohibited communications with a "party" represented by an attorney. 903 F.2d 731, 739-40 (10th Cir. 1990). We reaffirmed this view in *United States v. Mullins*, again applying a version of the no-contact rule that used the term "party" rather than "person." 613 F.3d 1273, 1288-89 (10th Cir. 2010).

We did not squarely apply the "authorized by law" exception in those cases. But other courts have applied this exception, concluding that the use of informants prior to indictment is generally authorized by law. *See* pp. 14-16, above. For example, Justice Alito, while serving as a judge on the Third Circuit Court of Appeals, observed in 1996 that virtually every federal appellate court to address the issue had held that Rule 4.2 does not

18

apply to pre-indictment criminal investigations. *United States v. Balter*, 91 F.3d 427, 436 (3d Cir. 1996) (Alito, J.). Writing for a Third Circuit panel, he explained that "even if a criminal suspect were a 'party' within the meaning of [Rule 4.2], pre-indictment investigation by prosecutors is precisely the type of contact exempted from [Rule 4.2] as 'authorized by law.'" *Id.*

Then-Judge Alito reasoned in part that a contrary approach would "significantly hamper legitimate law enforcement operations." *Id.* We employed similar reasoning in *Ryans*, stating that broad application of the no-contact rule would unduly hinder investigators. *United States v. Ryans*, 903 F.2d 731, 739-40 (10th Cir. 1990). We explained that the government should be able to capitalize on suspects' misplaced trust in others:

> A broader interpretation of the rule to cover this type of investigative activity would seem inconsistent with the general view expressed by the Supreme Court in *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966). As the District of Columbia Circuit observed in [*United States v. Lemonakis*, 485 F.2d 941, 955-56 (D.C. Cir. 1973)]:
>
> > [W]e cannot say that at this stage of the Government's investigation of a criminal matter, the public interest does not . . . permit advantage to be legally *and ethically* taken of "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."
>
> Under Ryans' view of the rule, once the subject of an investigation retains counsel, investigators would be unduly restricted in their use of informants to gather additional evidence.

19

*Id.* (second alteration in original) (citation omitted).

Similarly, in *United States v. Hammad*, the Second Circuit Court of Appeals expressed concern that applying the no-contact rule in criminal investigations "would impede legitimate investigatory practices," for "career criminals with permanent 'house counsel' [would be able to] immunize themselves from infiltration by informants." 858 F.2d 834, 839 (2d Cir. 1988).

Academics have echoed this concern. *See, e.g.*, Geoffrey C. Hazard, Jr. & Dana Remus Irwin, *Toward a Revised 4.2 No-Contact Rule*, 60 Hastings L.J. 797, 811, 817-18 (2009); Pamela S. Karlan, *Discrete and Relational Criminal Representation: The Changing Vision of the Right to Counsel*, 105 Harv. L. Rev. 670, 701 (1992). For instance, Professor Karlan has observed that

> [r]ead literally, the no-contact rule could quite obviously impede the investigation of complex crime. A potential defendant could retain an attorney, announce to federal and state prosecutors that he was represented by counsel with regard to all matters, and thereby prevent all governmental operatives (including informants and undercover agents) from eliciting statements from him. Moreover, corporations and other formal entities would be able to use their regular counsel to monitor and thus perhaps deter subordinate employees' contacts and cooperation with investigators. Such preclusion would be rendered particularly effective by a singular aspect of the no[]-contact rule: the lawyer, not the client, must consent to the direct contact. Thus, control over waiver would rest, at least in the first instance, in the enterprise counsel, because investigators would often be unable to determine whether an individual whom they wished to contact was actually a client of

20

an attorney who announced that "his client" did not wish to be contacted directly.

A broad interpretation of the no-contact rule would provide a powerful incentive for criminal actors to seek relational representation because having an ongoing relationship with an attorney could insulate them from several of the most effective law enforcement techniques for investigating complex crime.

Pamela S. Karlan, *Discrete and Relational Criminal Representation: The Changing Vision of the Right to Counsel*, 105 Harv. L. Rev. 670, 701 (1992) (footnotes omitted);[6] *see also* Geoffrey C. Hazard, Jr. & Dana Remus Irwin, *Toward a Revised 4.2 No-Contact Rule*, 60 Hastings L.J. 797, 811 (2009) ("[E]ffective law enforcement could be severely hampered by strict application of Rule 4.2."); 2 Restatement (Third) of the Law Governing Lawyers § 99 cmt. h (2000).[7]

---

[6] The Wyoming Supreme Court has consulted law review articles when they are considered persuasive. *E.g.*, *Yates v. State*, 723 P.2d 37, 41 (Wyo. 1986).

[7] The Restatement commentary provides:

Law-enforcement officials traditionally have resorted to undercover means of gathering important evidence. If retention of a lawyer alone precluded direct prosecutorial contact, a knowledgeable criminal suspect could obtain immunity from otherwise lawful forms of investigation by retaining a lawyer, while unsophisticated suspects would have no similar protection. Moreover, nonlawyer law-enforcement personnel such as the police are not subject to the rule of this Section. Rigidly extending the anti-contact rule to prosecutors would create unfortunate incentives to eliminate them from involvement in investigations.

In applying the "authorized by law" exception, we are guided by the near-unanimity of opinions applying this exception and policy considerations previously embraced by our circuit. Both lead us to conclude that the "authorized by law" exception allowed the Assistant U.S. Attorney to use an undercover informant, prior to indictment, to elicit incriminating admissions from Mr. Elliott. For this reason, Mr. Elliott's argument fails on the merits.

\* \* \*

In sum, we reject Mr. Elliott's argument for two reasons:

1.     Mr. Elliott's argument is waived. At a minimum, he forfeited the argument in district court and then waived the argument on appeal by failing to ask for plain-error review. Therefore, even if Mr. Elliott's underlying argument had been meritorious, it would not support reversal.

2.     Mr. Elliott's argument fails on the merits. Even if we were to credit his factual allegations, the Assistant U.S. Attorney would not have violated Wyoming's ethical rules.

## II.     Federal Funding of the Building's Owner: The Sufficiency of the Evidence and the Correctness of a Jury Instruction

Focusing on the conviction for arson, Mr. Elliott also argues that

- the evidence was insufficient for a finding of guilt and

- a jury instruction misstated the law.

---

2 Restatement (Third) of the Law Governing Lawyers § 99 cmt. h (2000); *see also Jones v. Union Carbide Corp*., 577 F.3d 1234, 1245 (10th Cir. 2009) ("In our view, . . . it would be too adventurous on our part to assume that Colorado would depart from the Restatements.").

These arguments involve the nature of the federal funding.

## A.      Sufficiency of the Evidence

On the challenge involving sufficiency of the evidence, we engage in de novo review, considering whether a rational jury could find Mr. Elliott guilty. *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000). We conclude that sufficient evidence existed for a finding of guilt.

Mr. Elliott does not question

- the use of the building by the county attorney's office or ownership by the county itself or

- the county's receipt of federal funds at the time of the bombing.

But Mr. Elliott points out that at the time of the bombing, the federal funds were not being directed to the building or to the county attorney's office.

The resulting question is a legal one: Does the arson statute apply even when federal funds are not being directed to the building that was bombed or to the entity that was occupying the building? In our view, the arson statute applies in this situation.

The statute expressly covers arson of any building owned by an entity receiving federal funds:

> Whoever maliciously damages or destroys, . . . by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, . . . any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than 5

23

years and not more than 20 years, fined under this title, or both.

18 U.S.C. § 844(f)(1) (2012). This statute applies here, for the building was owned by the county, which was receiving federal funds at the time of the bombing.

We addressed similar facts in *United States v. Apodaca*, 522 F.2d 568 (10th Cir. 1975). There the defendant bombed a police car that was owned by Fremont County and possessed by the Fremont County Sheriff's Office. *Apodaca*, 522 F.2d at 569-71. At the time of the bombing, the county and the county sheriff's office were receiving federal funds. *Id.* at 571-72.

The defendant contended that 18 U.S.C. § 844(f) did not apply because the police car had not been purchased with federal funds. *Id.* at 572. We explained that this fact did not matter because "[t]he clear and unambiguous language of the statute provides that it applies to *any* property owned, possessed, used by or leased to any organization receiving federal financial assistance." *Id.* Under this language, the statute applied because the police car had been owned by the county and possessed by the county sheriff's office. *Id.* at 571.

In our view, the *Apodaca* court would have arrived at the same result even if the county sheriff's office had not possessed the police car. The statutory language was disjunctive when *Apodaca* was decided, covering property "owned, possessed, *or* used by, *or* leased to, . . . any institution or

24

organization receiving Federal financial assistance." *Id.* (emphases added) (quoting the contemporaneous version of 18 U.S.C. § 844(f)(1)); *see United States v. O'Driscoll*, 761 F.2d 589, 597 (10th Cir. 1985) ("When the term 'or' is used, it is presumed to be used in the *disjunctive* sense unless the legislative intent is clearly contrary."). Thus, the county's ownership of the car was dispositive in *Apodaca*.

Ownership is also dispositive here. The statutory language remains disjunctive, covering property "owned *or* possessed by, *or* leased to, . . . any institution or organization receiving Federal financial assistance." 18 U.S.C. § 844(f)(1) (2012) (emphases added). The building was owned by Sheridan County, which was receiving federal funds when the bombing took place. Therefore, the statute applies under *Apodaca*.

Mr. Elliott suggests that we overrule *Apodaca* and follow *United States v. Hersom*, 588 F.3d 60 (1st Cir. 2009). In *Hersom*, the First Circuit took a narrower view of 18 U.S.C. § 844(f) than we had taken in *Apodaca*. *See Hersom*, 588 F.3d at 67 ("[I]n the case of organizations receiving federal financial assistance related to specific property, we construe section 844(f) as limited in general to arson of that particular property."). But "[w]e are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam). Mr. Elliott has not identified any Supreme Court opinions conflicting with *Apodaca*, and

we have not reconsidered *Apodaca* en banc. Thus, we remain bound by *Apodaca*.

Mr. Elliott also raises four arguments to distinguish *Apodaca*. We reject each argument.

First, Mr. Elliott asserts that the federal funds in *Apodaca* were "targeted for crime control," while "none of the moneys received by Sheridan County in 2012, 2013 and 2014 [had been] targeted to crime control, law enforcement or the building in which the County Attorney resided." Appellant's Opening Br. at 13. This difference is irrelevant; *Apodaca* held that if an entity receives federal funds, 18 U.S.C. § 844(f) applies if the entity owns the property that is bombed. *Apodaca*, 522 F.2d at 572.

Second, Mr. Elliott argues that the county attorney's office received only minimal federal funding in 2011. For this argument, Mr. Elliott apparently assumes that

- an entity receiving minimal federal funding is not covered by 18 U.S.C. § 844(f),

- the funding at issue in *Apodaca* was not "minimal," and

- the county attorney's office is separate from the county for purposes of 18 U.S.C. § 844(f).

We need not determine whether these assumptions are correct because Mr. Elliott's argument would fail anyway. Mr. Elliott bombed a building owned by the county, which received millions in federal funds

26

from 2011 to 2014. These funds constituted a substantial portion of the county's yearly budget. For example, in the year of the bombing, the county's federal funding (roughly $2.6 million) comprised about 12% of the county's entire budget. This amount of federal funding was not "minimal."

Third, Mr. Elliott contends that the Fremont County Sheriff's Office received "direct assistance." Appellant's Opening Br. at 13. In making this contention, Mr. Elliott apparently assumes that

- entities receiving federal funds through indirect channels are not covered by 18 U.S.C. § 844(f) and

- the Sheridan County Attorney's Office received federal funds only indirectly.

We reject Mr. Elliott's contention and conclude that *Apodaca* governs. Mr. Elliott bombed a building owned by Sheridan County, not a building owned by the Sheridan County Attorney's Office. He has not alleged that Sheridan County's federal funding was indirect or explained why the arson statute's applicability would turn on the directness of the federal funding.

Fourth, Mr. Elliott emphasizes that the Fremont County Sheriff's Office received federal funds in the same year that the bombing occurred. He points out that the Sheridan County Attorney's Office did not receive any federal funds in the three years before the bombing. This argument

27

fails because Sheridan County, which owned the building, was receiving federal funds when the bombing took place.

Under *Apodaca*, we reject Mr. Elliott's challenge to the sufficiency of the evidence.

**B.    Jury Instruction 24**

In district court, Mr. Elliott objected to Jury Instruction 24, contending that it misstated the law. The district court overruled this objection. On appeal, Mr. Elliott again argues that the jury instruction was flawed. But even if the jury instruction had misstated the law, the error would have been harmless.

Jury Instruction 24 stated that

> [i]n determining whether the property at issue was in whole or in part owned by an organization receiving federal financial assistance, it is sufficient if the Government proves beyond a reasonable doubt that the property was owned by Sheridan County at the time and that, during the time of its ownership of the property, Sheridan County *received* federal financial assistance.

R. vol. I, at 468 (emphasis added). Mr. Elliott challenges the jury instruction because it deviated from the language of 18 U.S.C. § 844(f). The instruction used the word "received," but 18 U.S.C. § 844(f) uses the word "receiving." In Mr. Elliott's view, the deviation is significant because the building and the county attorney's office had not received federal funds in the three years before the bombing.

28

Unlike Jury Instruction 24, another instruction on the elements used the statutory term "receiving." *Id*. at 464. Nonetheless, we may assume for the sake of argument that the word "receiving" should also have been used in Jury Instruction 24. Even with this assumption, the error would have been harmless[8] because it is immaterial when the county attorney's office received federal funds; what matters is when the owner of the building, the county, received federal funds. When the building was bombed, the county was receiving federal funding. Thus, even if Jury Instruction 24 had used the word "receiving" rather than "received," any reasonable jury would still have found that the owner of the building was receiving federal funds when Mr. Elliott committed the bombing. In these circumstances, any error in Jury Instruction 24 would have been harmless.

## III. Conclusion

In Mr. Elliott's view, the Assistant U.S. Attorney violated Wyoming's ethical rules by authorizing the undercover investigation. Mr. Elliott argues that the ethical violation should have led to suppression of his incriminating statements. This argument fails for two reasons. First, the argument is waived, for Mr. Elliott did not adequately present the argument

---

[8] The government does not argue harmlessness. In our view, however, the alleged error is certainly harmless. Thus, we raise the issue of harmlessness sua sponte. *See United States v. Holly*, 488 F.3d 1298, 1308 (10th Cir. 2007) (raising harmlessness sua sponte because the harmlessness was readily apparent and certain).

29

in district court and he has not asked us for plain-error review. Second, Mr. Elliott's argument fails on the merits. Even if we accept Mr. Elliott's factual allegations as true, the Assistant U.S. Attorney would not have violated Wyoming's ethical rules. Rule 4.2's "authorized by law" exception allowed the Assistant U.S. Attorney to use an undercover informant, prior to indictment, to elicit incriminating admissions from Mr. Elliott. For both reasons, we reject Mr. Elliott's challenge to the denial of his motion to suppress.

We also reject his challenges involving sufficiency of the evidence and the correctness of a jury instruction. Mr. Elliott bombed a building owned by Sheridan County, which was then receiving federal funding. Therefore, Mr. Elliott could be convicted of arson of a building owned or possessed by an entity receiving federal funds. Because the nature of the federal funding was undisputed, the alleged error in Jury Instruction 24 would have been harmless.

Affirmed.

Entered for the Court

Robert E. Bacharach
Circuit Judge

30

No. 15-8138, *United States v. Elliott*

**MORITZ**, J., concurring.

I join the majority's resolution of the issues relating to Elliott's arson conviction. *See supra* Part II. But unlike the majority, I wouldn't reach the merits of Elliott's thrice-waived suppression argument. Accordingly, I decline to join Part I of the majority opinion.

Although it doesn't heed its own ruling, the majority thoroughly and persuasively explains why, even assuming Elliott merely forfeited his suppression argument in the district court, he waived it on appeal by failing to argue for plain-error review. The majority also identifies two compelling bases for finding waiver in the district court. *See* Maj. Op. 5 n.4. First, Elliott declined the government's express invitation to argue for suppression based on alleged ethical violations. When an argument "was intentionally relinquished or abandoned in the district court," rather than simply inadvertently overlooked, "we usually deem it waived and refuse to consider it." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127-28 (10th Cir. 2011).

Second, even if Elliott only inadvertently overlooked his new argument, we've previously held that, regardless of intent, "a suppression argument raised for the first time on appeal is waived (i.e., completely barred) absent a showing of good cause for why it was not raised before the trial court." *United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011).[1] And while the majority notes that we have discretion in some

---

[1] We decided *Burke* under a previous version of Fed. R. Crim. P. 12(c)(3). But as the majority notes, *see* Maj. Op. 5 n.4, we've since held in two unpublished opinions that

instances to resolve waived arguments, *see* Maj. Op. 8-11, *Burke* unequivocally stated that "[w]hen a motion to suppress evidence is raised for the first time on appeal, we *must* decline review." *Id.* at 987 (emphasis added) (quoting *United States v. Brooks*, 438 F.3d 1231, 1240 (10th Cir. 2006)). Moreover, even if we have discretion to consider this belated suppression argument, I would decline to do so here where Elliott hasn't even attempted to show good cause for his failure to raise this suppression argument below. *Cf. id.* at 988 (noting that showing good cause is single, narrow exception to suppression-argument waiver rule).

Accordingly, while one waiver would suffice, Elliott has waived his suppression argument on three independent grounds. And as we've noted in another context, "three strikes are more than enough to allow [a] court to call a litigant out." *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1321 (10th Cir. 2011). But instead, the majority hypothesizes about what would have happened on the next pitch.[2] I would

---

*Burke*'s reasoning survives Rule 12's amendment. *See United States v. Shrader*, No. 15-5073, 2016 WL 4497984, at *4 & n.6 (10th Cir. Aug. 26, 2016) (unpublished); *United States v. Franco*, 632 F. App'x 961, 963-64 & 963 n.1 (10th Cir. 2015) (unpublished).

[2] Because it insists on answering the ethical question, the majority is forced to predict how the Wyoming Supreme Court would decide this unresolved issue. *See* Maj. Op. 13-14; *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1295 (10th Cir. 2017). But longstanding principles of comity and judicial restraint counsel against the majority's gratuitous prognostication. *Cf. United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *Michigan v. Long*, 463 U.S. 1032, 1039 (1983) (explaining that out of "[r]espect for the independence of state courts, as well as avoidance of rendering advisory opinions, . . . we do not wish to continue to decide issues of state law that go beyond the opinion that we review").

refrain from doing so for yet another reason: the rarity with which we employ the power that Elliott asks us to exercise in the first instance.

Although the majority fails to say so, both parties recognize that Elliott's suppression argument calls for us to exercise our supervisory power to exclude evidence based on willful disobedience of the law. *See* Aplt. Br. 23 (citing *United States v. Hammad*, 858 F.2d 834, 841 (2d Cir. 1988)); Aplee. Br. 21 ("[Elliott] asks this court to take the extraordinary step of exercising its supervisory power[] to suppress his statements . . . ."). We recently emphasized our "circumspect approach to the exercise of the supervisory power." *United States v. Lilly*, 810 F.3d 1205, 1219 (10th Cir. 2016); *see also United States v. Payner*, 447 U.S. 727, 734-35 (1980) (noting Court's "restrained application of the supervisory power," which Court "applie[s] with some caution").[3] We don't take lightly the assertion that a prosecutor has violated his ethical duties, and suppressing evidence is a stiff penalty. Thus, we typically demand full development of these issues in the district court. *Cf. United States v. Thomas*, 474 F.2d 110, 112 (10th Cir. 1973) (holding that "[t]he problem is initially one for the trial courts").[4] We lack the benefit of that development here.

In short, where a party has both waived an argument below *and* on appeal, I question the majority's decision to analyze it—especially when that argument asks us

---

[3] Because the majority resolves the ethical question in the government's favor, it ultimately declines to exercise our supervisory power. But that resolution doesn't retroactively justify the majority's willingness to even consider exercising this rarely used authority despite Elliott's multiple waivers of the issue.

[4] I couldn't locate a single case, and the parties cite none, where this court considered a supervisory power argument for the first time on appeal—and certainly not after we found that argument clearly forfeited or waived.

3

to exercise our supervisory power. Moreover, because the government has declined to fully brief the merits of this issue, the majority is forced to act as both advocate and arbiter in reaching and deciding this issue. Instead, I would wait until this issue is squarely presented to us, with adequate development below and adequate briefing by both parties on appeal. *Cf. Vasquez v. Los Angeles ("LA") Cty.*, 487 F.3d 1246, 1250 (9th Cir. 2007) (noting that effective advocacy "sharpens the presentation of issues upon which the court so largely depends for illumination" and thus improves judicial decision-making (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962))).